561 So.2d 992 (1990)
Josephine THOMAS, Cornell Martin, as Administrator for the Minor, Ariell Martin, and Edward Brooks, as Administrator for the Minor, Shantell Brooks
v.
SCHWEGMANN GIANT SUPERMARKET, INC.
No. 89-CA-0435.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1990.
*993 James B. Guest, Kenner, for plaintiffs/appellees.
Thomas G. Buck, Metairie, for defendant/appellant.
Before CIACCIO, WILLIAMS and PLOTKIN, JJ.
PLOTKIN, Judge.
Defendant Schwegmann Giant Supermarkets, Inc. (Schwegmann) appeals the liability and quantum awards to the plaintiff Josephine Thomas and her two grandchildren, Shantell Brooks, age 2, and Ariell Martin, age 4, for injuries suffered as a result of false or unlawful detention.
Facts
The trial court adopted Thomas' version of the incident, although the characterization of the events differ. The two versions are particularly inconsistent concerning whether Thomas opened merchandise, removed the contents from a package of "Stick On Crazy Nails," and whether she injured her arm.
Thomas, 57, testified that she was shopping at Schwegmann on July 22, 1986 at approximately 7 p.m. She was accompanied by her two grandchildren. While shopping, Thomas said that she stopped to examine an open box of "Stick On Crazy Nails" for approximately five minutes. She put the box down, finished her shopping, and paid for her groceries. As she was about to leave, she stopped to allow her grandchildren to get balloons from a clown in the front of the store. As she waited for her grandchildren, she was approached by Albert Roger, a security guard, who asked her to come with him; she and the children complied. Roger took them to a private room where another male guard, Richard Jackson Jr., was present. Thomas was questioned about the Crazy Nails; specifically, she was asked whether she stole glue contained in the kit. Thomas testified that she became nervous and upset and denied stealing glue or anything else from the kit. Roger sent for a female *994 employee to search Thomas. At this point, Thomas voluntarily displayed the contents of her purse, emptied her pockets, and opened her blouse to prove that she had not taken the glue. She admits that she became hysterical at this point because of the theft accusation.
Thomas testified that the guards called her "dumb" and cursed, threw her driver's license on the floor, and tried to force her to sign a confession form, but she refused. She expressed a desire to leave, along with outrage for being placed under arrest. Roger explained that she was not under arrest; however, Thomas claims that Jackson blocked the doorway so that she could not exit. Thomas testified that she walked to the door and opened it and that Jackson jerked the door closed, while her hand was on the knob, causing her serious aggravation of a pre-existing injury. Thomas was then brought to the cashier in the front of the store and forced to pay for the Crazy Nails. Upon leaving the room, Thomas encountered family acquaintances, who later drove her home because she was upset and shaking. The incident lasted 15 to 20 minutes.
The Schwegmann security guard, Roger, testified that he personally observed Thomas pick up the package of "Stick On Crazy Nails," place it in her basket, walk to another aisle, open the box of merchandise, remove the nails and try them on. Afterwards, he reportedly saw her deposit the nails on different store shelves and leave the partially empty box on another shelf. Roger then retrieved the nails and opened box. He claims that he believed that the artificial nail kit contained glue, necessary for application of the nails, which he was unable to locate on the shelves or in the box. He therefore approached Thomas, identified himself and requested that she accompany him to a private office for the purpose of paying for the merchandise.
Roger admitted that he did not closely examine the box prior to detaining Thomas. As a result, he was incorrect in his assumption that glue was a part of the contents. However, it is undisputed that his purpose in stopping Thomas was to determine whether she had stolen the glue and that he intended to request that she pay for the nails.
Both security guards maintain that Thomas was abusive and uncooperative and that for no reason, she became hysterical, threw the contents of her purse on the floor, and opened her blouse. Furthermore, they claim that Thomas' arm was not re-injured. They claim that Jackson stood with his back to the door throughout the incident and that the door was never opened until Thomas left the room to pay for the merchandise.
The trial court found that the immunity provided to store owners and operators under La.C.Cr.P. art. 215 did not apply and awarded Thomas $15,000 plus medical expenses. He also awarded the grandchildren $2,000 each to compensate for their unlawful detention.
Schwegmann appeals these awards as unreasonable, claiming that the guards behaved within the scope of a merchant's immunity provided for in La.C.Cr.P. art. 215. On appeal, Schwegmann claims that the trial court erred in the following ways:
(1) Finding that the detainment was not based on the reasonable belief that Mrs. Thomas had committed theft, which is protected by La.C.Cr.P. art 215,
(2) Making any award to the grandchildren, who Schwegmann characterizes as mere bystanders,
(3) Awarding Mrs. Thomas $1,145 for chiropractic treatment subsequent to the incident, since the cause of her pain could have been a previous injury,
(4) Conducting examination of witnesses, including leading questions, on direct and cross examination.
Is Schwegmann Immune from Liability for the Detention?
Schwegmann claims civil immunity for the 15 to 20 minute detention, based on La.C.Cr.P. art. 215, which permits a merchant, or a specifically authorized employee to "use reasonable force to detain for questioning... not to exceed 60 minutes ... when he has reasonable cause to believe *995 that the person has committed a theft of goods."[1] (Emphasis added.)
In passing La.C.Cr.P. art. 215, the legislature delegated quasi-police powers to a peace officer, merchant, or a specifically authorized employee or agent of a merchant to combat shoplifting. Private persons ordinarily have no authority to arrest for petty theft, which is only a misdemeanor.[2] La.C.Cr.P. art. 215 grants civil and criminal immunity from liability for malicious prosecution when the detainor has reasonable cause to believe that a theft of goods, a separate crime defined by LSA-R.S. 14:67.10[3], has occurred. Because criminal statutes are strictly construed, LSA-R.S. 14:3, the immunity granted by La.C.Cr.P. art. 215 applies only when a person is detained on suspicion of committing a theft of goods.
The determination of whether the detention is immunized also depends upon whether "reasonable cause" exists to believe that the suspect committed a theft of goods. "Reasonable cause" is defined as "something less than probable cause; it requires that the detaining officer have articulable knowledge of particular facts sufficiently reasonable to suspect the detained person of criminal activity." State v. Hudgins, 400 So.2d 889, 891 (La.1981). The reason the legislature chose this high standard was that it does not want a citizen to be legally detained and questioned by a non-police official unless the detainor knows of facts and circumstances which warrant prudent and reasonable men to believe that a theft of goods was committed.
In order for plaintiff to recover from a merchant for the tort of false imprisonment, she must prove that a detention occurred under one or more of the following circumstances: (1) unreasonable force was used, (2) no reasonable cause to believe that that the suspect had committed a theft of goods existed, or (3) the detention lasted more than 60 minutes, unless it was reasonable under the circumstances that the suspect be detained longer.
Thomas testified that she picked up the open package of nails, examined it for five minutes, and returned it to the shelf. Roger stated that she removed the box from the shelf, placed it in her basket, walked away and opened the box. Thereafter, she placed the nails on various shelves and then deposited the box on another shelf. Roger said that he retrieved the box before he approached Thomas. The Crazy Nails package has a section marked "contains ...," followed by a list of the package contents. Glue is clearly not listed as one of the contents. Furthermore, the labeling on the package face *996 clearly indicates in three prominent locations that the nails are applied with "stick-on" tape, not glue. Jackson, the second security guard involved in the incident, admitted at trial that he knew that no glue came with the Crazy Nails kit. Rogers could quite easily have examined the kit in his possession to determine that glue was not included in the box before he detained Thomas and accused her of stealing glue.
We conclude that Roger, a trained security guard for thirteen years at Schwegmann and a former member of the New Orleans Police Department, should have inspected or examined the Crazy Nails box in his possession before he detained, questioned, and accused Thomas of stealing the glue. He had sufficient time and opportunity to reasonably investigate the facts. Thomas made no effort to leave the premises. Roger knew or should have known that Thomas did not steal glue from the kit. We hold that Schwegmann did not have reasonable cause to detain Thomas and that the civil immunity from liability provided by La.C. Cr.P. art. 215 is not applicable.
Schwegmann argues that La.C. Cr.P. art. 215 provides immunity for its detention of Thomas despite the fact that Roger knew or should have known that Thomas did not steal the glue because Roger had reasonable cause to believe that Thomas had damaged merchandise. Schwegmann argues that the La.C.Cr.P. art. 215 also provides immunity from civil liability for false imprisonment when a shopper is detained and questioned on the suspicion that he damaged merchandise or opened sealed boxes and packages. The evidence indicates that one of the reasons for detaining Thomas was Roger's belief that she opened the Crazy Nails kit, thereby destroying its retail value. Schwegmann's answer to the lawsuit and Jackson's testimony indicate that he believed that Thomas had damaged merchandise and that that was the sole reason for her detention.
However, La.C.Cr.P. art. 215 refers only to the theft of goods, a crime which has been specifically defined by the legislature in LSA-R.S. 14:67.10. Theft of goods requires an intent to deprive the merchant permanently of whatever may be the subject of the misappropriation, which intent may be inferred from five explicit types of misconduct. This criminal statute unequivocally does not include damage to merchandise. We decline to extend immunity to a merchant for detention of a customer who has only damaged merchandise. We hold that Schwegmann did not have the legal authority to detain and question Thomas for damage to merchandise.
The evidence is undisputed that Thomas was physically detained. She was escorted by two male security guards, one who identified himself and led her to a small room. She was questioned and was not permitted to leave when she wanted to because Mr. Jackson blocked the door. The time element is not an issue here. Because Schwegmann failed to prove the existence of any of the circumstances which give rise to immunity under La.C.Cr.P. art. 215, we affirm the trial court's finding that Thomas was falsely detained and/or falsely imprisoned and that Schwegmann is not entitled to immunity for the detention.
Were the Grandchildren Detained, and, if so, are They Legally Entitled to an Award for False Imprisonment and Emotional Distress?
Two small children were in the custody of Thomas, their grandmother, at the time of her detention. When she was taken to the investigation room, the children accompanied her because there was no one available to supervise them outside the room. The children were present throughout the incident, despite the fact that Thomas requested at the beginning of the incident that the children be allowed to remain outside the room.
We hold that the children were not illegally falsely detained or imprisoned. Their constraint was derivative to Thomas' detention, which arose from a propinquity. They were not accused of any misconduct. Therefore, they are not entitled to damages for false imprisonment because they were bystanders to the incident.
*997 Schwegmann further contends that the children are not entitled to damages for emotional distress for witnessing the event, as a matter of law.
The evidence indicates that when Thomas became upset, both children started crying. Their fathers testified that neither child sought or received any medical attention as a result of the incident. They claim that they noticed changes in their children's sleep patterns evidenced by the fact that the children came into their bedrooms during the night. The trial court awarded $2,000 to each child.
The recent Louisiana Supreme Court decision of Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990) defined the criteria for recovery for mental anguish sustained by a person not directly injured because of negligent infliction of emotional distress on a third person. Prior jurisprudence prevented recovery. In Lejeune, the court decided that the following conditions must exist for recovery by a bystander:
1. A claimant need not be physically injured, nor suffer physical impact in the same accident in order to be awarded mental pain and anguish damages arising out of injury to another. Nor need he be in the zone of danger to which the directly injured party is exposed. He must, however, either view the accident or injury-causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition.
2. The direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience.
3. The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating.

. . . . .
4. A fourth restriction concerns the relationship of the claimant and the direct victim.
Id. at 570. The Supreme Court failed to define the exact class of permissible claimants because the plaintiff in the Lejeune case was the spouse of the direct claimant and therefore definitely qualified. Id. at 571.
In the instant case, the grandchildren fulfill conditions 1, 2 and 4 since they were present during the incident which caused Thomas' injury, Thomas suffered such harm that it could reasonably be expected that the children would suffer serious mental anguish as a result of the incident, and the grandchildren are close relatives of the injured party. However, they fail to meet the third standard because their emotional distress was apparently neither serious or reasonably foreseeable. The record in this case contains no evidence of any serious mental pain and anguish. Testimony from their fathers that two minors, aged 2 and 4, lost some sleep, without further corroboration, is not sufficient proof to justify an award for mental distress.
The judgment of the trial court awarding Shantell Brooks and Ariell Martin $2,000 each for their false imprisonment and/or mental pain and suffering is reversed.
Were Thomas' Damages Properly Computed?
The trial court awarded Thomas $15,000 for aggravation of a pre-existing injury and false imprisonment. We have examined the recent jurisprudence for comparable awards for false imprisonment based on facts similar to those presented by this case; they range from $1,000 to $22,500. In Attaldo v. Schwegmann Giant Supermarkets, Inc., 469 So.2d 1132 (La.App. 4th Cir.), writ denied 475 So.2d 354 (La.1985), the court awarded $1,000 to a customer who was detained for three hours and 45 minutes, but did not suffer any physical injuries or residual effects. Likewise, in Johnson v. Schwegmann Bros., 397 So.2d 868 (La.App. 4th Cir.1981), the plaintiff was awarded $1,000. On the other end of the scale is Thomas v. Winn-Dixie Louisiana, Inc., 477 So.2d 925 (La. *998 App.4th Cir.1985), in which a woman who had been subjected to excessive inquiry despite facts which indicated her innocence and who suffered psychological trauma for at least two years after the incident was awarded $22,500. In the middle is an award of $9,000 to an arrestee who suffered both detention and humiliation before his peers, as well as an aggravation of a preexisting nervous condition. Bender v. Schwegmann Bros. Giant Supermarket, Inc., 452 So.2d 771 (La.App. 4th Cir.1984).
In the instant case, Thomas had a complex and severe medical history predating this incident. Her medical records at the We Care Clinic reveal that she suffered from urinary infections, high blood pressure, arthritis, diabetes, obesity, migraine headaches, and female problems. On May 19, 1986, Thomas was struck by a door while entering a Winn-Dixie store. She consulted Dr. Antoini Ky, a chiropractor, for injury to her neck and right arm. He diagnosed her injuries as a nerve root irritation and ordered regular chiropractic adjustments, medicine and a neck collar. She was undergoing active treatment with him on July 22, 1986, when this incident occurred.
On July 23, 1986, the day after the incident, Thomas visited the We Care Clinic. The only reference in the medical records to the incident at Schwegmann is a notation on that date that Thomas was "nervous from her arrest." A prescription for Valium was issued and refilled on two or three occasions. Unfortunately, the plaintiff's medical expert, Dr. Robert Lesser, opined after reviewing all the medical records and personally evaluating and treating Thomas that he was unable to testify that her anxiety and depression were related to her false imprisonment. The trial judge noted in his comments that the "doctor never heard her say she was upset or disturbed because of her arrest." Considering the above evidence, we award Thomas $5,000 for her wrongful detention.
Concerning Thomas' physical injury, Dr. Ky testified as an expert chiropractor and stated that he also examined Thomas on July 23, 1986, the day after the incident at Schwegmann. His history indicates that she injured her right arm, shoulder, and neck when the door she was holding was slammed shut. He treated Thomas with adjustments on 27 occasions and examined her once thereafter. He discharged her on November 5, 1986, with the opinion that she had sustained an aggravation of her pre-existing injury to her neck, shoulder and right arm as a result of the incident.
We find that the trial court was not manifestly erroneous in concluding that Thomas sustained a physical injury as a result of the incident at Schwegmann. We are cognizant of the fact that the defendant's witnesses denied the event. Furthermore, we recognize that it is uncommon for a person to suffer an injury because he or she chooses to continue to hold on to a door that is being closed when he or she could have simply released the door and avoided the injury. However, considering Thomas' past medical history, her pre-existing condition, the absence of any evidence of emotional distress, and her treatment by the chiropractor, we find that $2,500 is the maximum award she should receive. We award her $2,500 for her physical injury, plus $1,445 for the chiropractic treatment, for a total of $3,945. Her damages total $8,945.
Was the Trial Judge's Conduct Improper?
Schwegmann contends that during the trial, the judge conducted extensive direct and cross examinations, commented on the evidence, and admonished defense counsel unnecessarily. The defendant claims that the court's active injection into the trial exceeded his discretion and evidenced bias and prejudice in favor of the plaintiff.
We have scrutinized the record in this case closely and conclude that any errors caused by the trial judge's abuse of discretion in conducting the trial have been recognized and corrected.
Conclusion
For the above and foregoing reasons, the judgment of the trial court awarding plaintiff Josephine Thomas damages for false imprisonment and aggravation of a pre-existing injury against defendant Schwegmann *999 Giant Supermarkets, Inc. is affirmed. The judgment is amended to award Thomas $8,945 in damages rather than the $16,445 awarded by the trial court. The judgment awarding Shantell Brooks and Ariell Martin $2,000 each for mental distress is reversed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED.
NOTES
[1] La.C.Cr.P. art. 215 provides, in pertinent part, as follows:

A. (1) A peace officer, merchant, or a specifically authorized employee or agent of a merchant, may use reasonable force to detain a person for questioning on the merchant's premises, for a length of time, not to exceed sixty minutes ... when he has reasonable cause to believe that the person has committed a theft of goods held for sale by the merchant, regardless of the actual value of the goods. The merchant or his employee or agent may also detain such a person for arrest by a peace officer. The detention shall not constitute an arrest.
(Emphasis added.)
[2] See La.C.Cr.P. art. 214, which gives private persons the authority to arrest only when the person arrested has committed a felony.
[3] La.R.S. 14:67.10 defines theft of goods as follows:

A. Theft of goods is the misappropriation or taking of anything of value which is held for sale by a merchant, either without the consent of the merchant to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the merchant permanently of whatever may be the subject of the misappropriation or taking is essential and may be inferred when a person:
(1) Intentionally conceals, on his person or otherwise, goods held for sale;
(2) Alters or transfers any price marking reflecting the actual retail price of the goods;
(3) Transfers goods from one container or package to another or places goods in any container, package, or wrapping in a manner to avoid detection;
(4) Willfully causes the cash register or other sales recording device to reflect less than the actual retail price of the goods;
(5) Removes any price marking with the intent to deceive the merchant as to the actual retail price of the goods.